IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:19CR111 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | |
| | ) | |
| BRIAN LOUK, | ) | UNITED STATES' SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

The United States of America, by its counsel, Justin E. Herdman, United States Attorney,

and Carol M. Skutnik, Assistant United States Attorney, respectfully submits this memorandum

setting forth the United States' position regarding the sentencing of Defendant Brian Louk.  For

the reasons set forth below and those to be articulated at the sentencing hearing, the United

States submits that a Guideline sentence in the range of 151 to 188 months is appropriate in this

case.

Respectfully submitted,

JUSTIN E. HERDMAN
United States Attorney

By:     /s/ Carol M. Skutnik
        Carol M. Skutnik (OH: 0059704)
        Assistant U.S. Attorney
        Suite 400, U.S. Courthouse
        801 West Superior Avenue
        Cleveland, Ohio 44113–1852
        Tel. No. (216) 622-3785
        E-mail: carol.skutnik@usdoj.gov

I.      **FACTUAL BACKGROUND**

To support its sentencing position, the United States offers the following summary of

Defendant Louk's conduct. The United States also refers the Court to the description included in

the Presentence Investigation Report ("PSR").  (R. 21: PSR, PageID 72-74).

A.      INVESTIGATORS DOWNLOAD CHILD PORNOGRAPHY FROM LOUK ON
        THE GNUTELLA PEER TO PEER NETWORK

In January of 2019, Euclid Police Detective, Dan Sumpter, identified a user known as

"animal" on the Gnutella[1] peer to peer network that was sharing and downloading images and

videos of child pornography.  The investigation later revealed that Brian Louk was "animal."

Det. Sumpter routinely monitors activity on the Gnutella file sharing network by using a program

that searches for known child pornography by hash value.

Between the dates of December 17, 2018 and January 8, 2019, Det. Sumpter was able to

conduct a single-source download from Louk of one complete video and multiple partial

segments of videos that depict child pornography.  The complete download was a video named

"pthc 2014 webcam omegle vichatter skype two girls 2girls" that was 19:29 minutes in length.

The video depicted two young girls, approximately 10 years old, who are partially nude from the

waist down.  The girls are touching and licking each other and themselves in their vaginas and

are observed placing objects inside their vaginas.

Det. Sumpter noted that Louk was downloading images daily on Gnutella.  For example,

on January 8, 2019, Louk downloaded 25 files between the hours of 6:00 pm and 8:00 pm.

---

[1] Gnutella is a large peer-to-peer network that was established in 2000.  It provides its clients the
ability to search download, and upload files across the internet.  The Gnutella network has
several clients, such as Shareaza, Zultrax P2P, and Wireshare (formerly Limewire), that work on
its network.  *See* Lifewire website: https://www.lifewire.com/definition-of-gnutella-818024

Further, Det. Sumpter could see that between the dates of February 8, 2017, and January 2, 2019,

Louk had 158 :Child Notable/Child Erotic/Child Other/Unknown Content" unique files that he

was sharing.

Det. Sumpter then made contact with the North Ridgeville Police Department, who made

17 single-source complete downloads of child pornography from Louk between the dates of

August 6, 2018, and December 10, 2018.  The North Ridgeville police also made 17 complete

downloads of child pornography from Louk.  Below are a list of the images North Ridgeville

downloaded from Louk (Exhibit A, redacted to exclude any possible victim identifiers):

| File | Date | Type | Size |
|---|---|---|---|
| !Mlg - Daddy's Little Whore At 5Yo (Baby... | 8/7/2018 11:17 AM | Video Clip | 36,411 KB |
| (pedo-star) Ptsc 2 8yo Lolitas (Full) | 11/20/2018 12:08 ... | Video Clip | 529,220 KB |
| (pthc 2018) Brazilian 6yo INCREDIBLE EXP... | 12/10/2018 11:24 ... | MP4 Video | 123,872 KB |
| (PTHC 2018) SOUND Bathroom blowjob ... | 12/10/2018 11:40 ... | MP4 Video | 141,862 KB |
| 0██ 17Yo Shows ██ 10Yo And Her Gir... | 12/10/2018 12:11 ... | Movie Clip | 202,843 KB |
| 34 (Sdpa) - ██-Christ - 11Yr - Bro Fuk... | 11/10/2018 11:54 ... | Movie Clip | 129,248 KB |
| 2015-03 - ██ Suit 9yo | 8/6/2018 11:13 AM | Video Clip | 28,367 KB |
| 2016██Latina Anal 6yo | 9/2/2018 1:48 PM | Video Clip | 17,969 KB |
| online_girls_0175 | 8/27/2018 10:42 AM | MP4 Video | 33,724 KB |
| OPVA PTHC 2016 webcam 11yo boy & 1... | 11/10/2018 11:50 ... | Video Clip | 34,576 KB |
| Pedofilia-VTCAP 01 - Little Lolita Build (a... | 11/20/2018 11:49 ... | Movie Clip | 401,549 KB |
| pthc - ██ - 8 yo girl ,  spread pussy | 10/29/2018 12:45 ... | Video Clip | 29,519 KB |
| pthc 2014 webcam omegle vichatter sky... | 12/10/2018 11:21 ... | Video Clip | 99,951 KB |
| Pthc 2015██ ██Pra No... | 9/4/2018 1:37 PM | Video Clip | 28,537 KB |
| PTHC 2016 Portugal new - 10yo fucking ... | 9/25/2018 1:48 PM | MP4 Video | 74,896 KB |
| pthc 2017 Thai sisters | 11/20/2018 11:17 ... | Video Clip | 70,566 KB |
| Younow Snapchat 2016 - Three 13yo girls... | 11/12/2018 4:55 PM | Video Clip | 63,388 KB |

Det. Sumpter reviewed the North Ridgeville downloads and found them to contain the

following representative images:

a.      File downloaded on 8/7/2018

      Name: !Mlg - Daddy's Little Whore At 5Yo (Babyj A) Kleuterkutje Hard Fck Good
      Quality.avi

This video was viewed by Detective Sumpter and found to depict a toddler female being vaginally and anally penetrated by an adult male.  The adult male also ejaculated on the toddler's stomach after the rape occurred. The length of this video is 9:01 min.

b.      File download on 8/6/2018

Name: 2015-03 – Red  Suit 9yo.avi

This video was viewed by Detective Sumpter and found to depict a prepubescent female under the age of 10 yrs old in a bedroom, masturbating vaginally and anally on camera using her fingers and a hairbrush. The length of this video is 31.54 min.

c.      File downloaded on 8/27/2018

Name: online_girls_0175.mp4

This video was viewed by Detective Sumpter and found to depict two prepubescent females one approximately under 10 yrs and the other approximately 13 yrs old undressing in front of camera showing and touching their vaginas. The video is 8.34 minutes in length.

d.      File download on 9/2/2018

Name: 2016 ███ ████ Anal 6yo.avi

This video was viewed by Detective Sumpter and found to depict a prepubescent female approximately 10 years of age wearing only a striped shirt being anally penetrated by an adult male penis on a bed.  This video is 8:01 minutes in length.

e.      File download on 9/2/2018

Name: Pthc 2015 ██████ ████████ ███ ████████.avi

This video was viewed by Detective Sumpter and found to depict a prepubescent female under the age of 10 yrs old dancing in front of a camera completely naked.  While dancing she touches her anus and vagina.  The video changes to this female on a chair or bed and she spreads opens her vagina and inserts her finger inside her vagina.

f.      File download on 9/25/2018

Name: PTHC 2016 Portugal new - 10yo fucking Best video ever.mp4

This video was viewed by Detective Sumpter and found to depict a prepubescent female under the age of 13 years old partially naked being vaginally penetrated by an adult male. The adult male was lying on his back and the victim was on top of the adult male.  This video was 7:35 minutes in length.

g.      File download on 9/25/2018

Name: pthc - ██████ - 8 yo girl , spread pussy.avi

Detective Sumpter viewed this video and found it to depict a prepubescent female that appears to be under the age of 10 years old, undressing, and using the toilet.  The child then lays back while an adult spreads open her vagina and touches her vagina.  This video is 3:53 minutes in length.

North Ridgeville Police also downloaded 19 partial child pornography files from Louk.

B.      THE SEARCH WARRANT AND INTERVIEW

        1.      Execution of search warrant on Homer Court in Elyria, Ohio

On January 18, 2019, the Elyria Police Department and Agents of the Cleveland FBI,

including SA Kelly Liberti, executed a search warrant on Homer Court in Elyria, Ohio.  Det.

Sumpter introduced himself to both Brian Louk and his wife, Patricia, and informed them he was

there to execute a search warrant based upon an investigation into the dissemination of child

pornography.  Patricia Louk told officers they did not have any child pornography, at which

point Brian Louk responded "I did it.  I have a sickness, it's up on the computer upstairs."

Louk's old e-machine computer was confiscated from an upstairs bedroom lined with his toy car

collection.  (Exhibit B)  A single DVD video was located in the desk drawer titled "She's Too

Young."  (Exhibit C)



2.    The interview with Louk

Louk was advised of his Miranda warnings and agreed to speak with Det. Sumpter and FBI SA Liberti.  The 33 minute interview was recorded.  It was on a sharing site."  When asked if it was a website or an app, Louk responded "it's a thing where you get music off of it."  When asked what it's called, he responded "Sharenza (phonetic spelling)."  Louk stated he did not know if he had a user name on Shareaza but was adamant that it was not "animal[2]."  Louk appeared to have limited computer knowledge.  When asked where the child pornography was located, such as a file name, he simply said "It's in that computer."  In the entire interview – Louk never mentioned taking any steps to disable sharing.

When asked how long he had been downloading child pornography, Louk responded "Probably since I lost my eye.  Lost my career."  He stated he was injured in 2012 and that he thought he started downloading it five years ago.  "Started out as little things. I don't know why it's a sickness but I can see why it is," said Louk.  "I do it while I was alone."

Louk told Det. Sumpter that he was not sexually aroused by the child pornography.  He said it was a "rush" like "watching videos of people getting their head chopped off."  He claimed he used search terms like "young girls" to find images. Louk said he also watched death videos or anything with shock value, however he did not save those.   Louk denied ever touching a child sexually.  Later in the interview, SA Liberti pressed Louk as to whether he masturbated to the videos.  Louk then admitted that he "occasionally" masturbated to the images.

---

[2] In fact, Louk's user name on Shareaza was his nickname, "animal."

3.     The Forensic Review of Devices

LOUK's computer, an old e-machine, was seized and the hard drive was previewed by officers from the Ohio Internet Crimes Against Children Task Force.  The preview revealed LOUK had several hundred videos depicting child pornography on the computer, 32 of which were imaged for the purpose of the on-scene triage report.  The following video descriptions are an example of the types of images found during the preview:

a.  **File name:  Daisy's Destruction parts 2_3_4**
A 17:39 minute video which depicted the rape and torture of an infant female.  An adult female wearing a mask put the baby's face into her vagina, digitally penetrated the baby's vagina, then hit the child.  The adult female held the baby down as the baby screamed, rubbed ice over the infant and placed an ice cube in the baby's anus.   The adult female then bound the baby's hands and feet to two rods with duct tape, placed duct tape over the baby's mouth and hung the baby upside down.  The adult female then placed clothes pins on the baby's nipples and labia of the baby's vagina, placed an ice cube in the baby's vagina, then hit the baby in the vagina.  The adult female then dripped candle wax into the infant's vagina.  The next scene showed the adult female holding the infant over a toilet and urinating on the baby's face while the baby screamed.  The final scene showed the adult female pouring a pitcher of water over the baby's face as the baby wailed.

b.  **File name:  95754**
A 2:29 video showing a female infant being anally penetrated by an adult male.

c.  **File name:  Pedomom2016mix-Great**
A 7:03 minute video first showing an adult female performing oral sex on the penis of a prepubescent male child.   The next scene showed the penis of a dog being forced into the mouth of an infant male while infant cried.  The next scene showed an adult female holding an infant male and placing her mouth on the baby's penis.  The final scene showed a female adult masturbating the penis of a naked prepubescent male child who was placed on a bed and appeared to be drugged.

d.  **File name:  Pornflix and chill watching PORN with Daddy Pedo blowjob swallow**
An 8:06 video of a naked prepubescent female masturbating her genitalia for the camera.  The video then showed the same female child performing oral sex on an adult male penis.

On January 25, 2019, Det. Sumpter initiated a forensic examination of Louk's e-machine computer.  The computer had a 160 GB hard drive, very small under current standards for storage.  The main "user" listed was "animal" but there were several other "users" created with

similar names.  Det. Sumpter located the installed Shareaza on the e-machine in the folder "program files."  According to the system registry, the application was set to "share" files once they were downloaded.  This is the default setting for the application but can be changed at the time of installation or after the program is installed.  (See Exhibit D attached: A screen capture of the installation process for the version of Shareza employed by Louk).

The default folder for shared files is "Downloads", which is where Det. Sumpter located approximately 749 separate completed video downloads that were flagged as child pornography.  Det. Sumpter previewed these images and confirmed they contained child pornography.  The videos depicted children between the age of newborn to teenagers who were blindfolded, tortured, and forced to have anal, vaginal, and oral sex with adult males, females and animals.  In addition, there were 341 partial files that contained suspected child pornography based upon their title, that were located in "fileslack" or "freespace" (recycle bin) on the hard drive.  Fifty-three of the videos were tagged as "infant/toddler" and nineteen of the videos were tagged as sadistic/masochistic/violence."

Det. Sumpter also located search terms that were manually entered by Louk in the Shareaza search box for the content he wanted.  Those search terms included the following:

| otseto | whatsapp | bedroom mirror | pool | online_girls |
|---|---|---|---|---|
| snapchat | fat kid | nanny | pockyin | lesbo |
| fat | nannycam | 2019 | 2018 | chubby |
| teacher cam | omegle | sister | phant | girls in skype |
| sister bedroom | | periscope | little sister and brother | |
| halloween | OXB | webcam 2018 | secret | ohv |
| webcam | leotards | playground hidden cam | | puffy |

| | | | | |
|---|---|---|---|---|
| compilation | playground | kids got talent | paradise | muly |
| sound | paridise | upskirt | skype | costume |
| skinny blonde | | show and tell | lolicon | Bettina |
| redhead | 2 girls | younow | babysitter | 10yr |
| younoow | show pussy to neighbor | | 7yr | 2017 |
| show pussy 2018 | 7 | Daisy | show pussy | Portugal |
| black mom | pedomom | bedroom | lollipop | |

## II.   APPLICABLE LEGAL STANDARDS

### A.   LEGAL PRECEDENT FOR GUIDELINE SENTENCE

The United States' request a Guideline sentence in the advisory range of 151-188 months, consistent with the law and research highlighting the danger posed by child pornography offenders. Numerous courts have emphatically expressed the wretched consequences of child pornography. For example, this Court in United States v. Cunningham, 680 F. Supp. 2d 844, 847 (N.D. Ohio 2010), *affirmed* 669 F.3d 723 (6th Cir. 2012), imposed a guideline sentence on a child pornography defendant.  In denying the defendant's challenge to the legitimacy of the child pornography guideline, the same one that applies to Louk, the court reasoned:

> There can be no keener revelation of a society's soul than the way in which it treats its children.  Given the current statistics surrounding child pornography, we are living in a country that is losing its soul.

> Child pornography is a vile, heinous crime.  Mention the term to your average American and he responds with immediate disgust and a sense of unease.  However, once it enters the legal system, child pornography undergoes sterilization.  The sterilization goes far beyond properly removing emotion from sentencing decisions. Images are described in the most clinical sense.  Victims all too often remain nameless.  The only emotions on display are those of defendants, sorry that their actions were discovered by law enforcement.

1.    The Studies support the serious nature of child pornography offenses.

While it is true that the § 2G2.2 advisory guidelines have evolved since the 1990s, it is

clear that both Congress and the courts have had access to more and better information about

child pornography offenders.  In fact, recent research published in the Journal of Sexual

Aggression demonstrates that the § 2G2.2 increases were justified:

> Crimes involving the possession, distribution, or manufacture of
> child pornography constitute violations of specific laws pertaining
> to the receipt and transmission of child abuse/exploitation images,
> and as a result there is a tendency for some individuals to assume
> these offenders are somehow distinct from child molesters (i.e.,
> 'hands-on' abusers). This assumption, in fact, is a key reason why
> recent years have seen an increase in judicial sentences that fall
> below sentencing guidelines (United States Sentencing
> Commission, 2012), a trend that may be attributable to an
> impression that the rate of 'crossover' between child pornography
> collection and hands-on abuse is low (Eke & Seto, 2011; Endrass
> et al., 2009; Seto, Hanson, & Babchishin, 2011).
>
> The logic of this conceptual view is somewhat befuddling. It
> ignores the observation that individuals who molest children and
> those who download and masturbate to child pornographic images
> share a primary motivational pathway - both are sexually aroused
> by minors (Seto et al., 2006). It therefore should come as no
> surprise that offenders whose sexual fantasies and urges involve
> children are able to derive pleasure and gratify their deviant
> impulses through a variety of means, and it suggests that
> significant 'crossover' may exist between these crimes.
>
> Although some research (Elliott, Beech, Mandeville-Norden, &
> Hayes, 2009; Howitt & Sheldon, 2007; Webb, Craissati, & Keen,
> 2007) has shown differences between groups of 'online' and
> 'offline' offenders, most is limited by an important assumption;
> that is, an individual is a hands-off offender simply because
> official records do not reflect contact sexual offending. This
> assumption appears unwise, given the base rates for detecting
> sexual abuse are extraordinarily low, the finding that most victims
> of abuse never report their victimization to law enforcement, and
> the low percentage of arrests leading to convictions (Centers for
> Disease Control and Prevention, 2010; National Centers for Policy
> Analysis, 1999; US Department of Justice, 2010, 2012).
> *Researchers should never assume an offender has not committed a*

10

> *hands-on crime merely because his or her criminal record does not*
> *reflect such a charge or conviction.* [3]

This study goes on to describe its own processes as well as results.  The study was comprised of 127 persons under investigation for the possession, receipt, or distribution of child pornography who agreed to take a polygraph examination regarding their hands-on activity.[4] These individuals had no known history of hands-on offending.[5]  Six individuals (4.7%) admitted to sexually abusing at least one child prior to the polygraph.[6]  However, during the polygraph procedures, an additional 67 individuals (52.8%) of the study sample provided disclosures about hands-on abuse they had perpetrated.  That means a total of 57.7% of the sample admitted to *previously undetected hands-on sexual offenses.*[7]  For children and judges, that percentage gives worse odds than a coin-toss.  Even more shocking is the total number of hands-on victims for these 73 individuals:  282 children, nearly four per offender.[8]

This study is important because it supports the results of prior studies, i.e., that child pornographers have high rates (as high as 85%) of previously unreported sexual offenses against children.[9]  This should come as little surprise, as other studies that relied solely upon prior

---

[3] M.L. Bourke, et. al., "The use of tactical polygraph with sex offenders," *Journal of Sexual Aggression* (2014), p. 5-6 (emphasis added).

[4] Id. at 8.

[5] Id.

[6] Id.

[7] Id.

[8] Id. at 9, Table I.

[9] Michael L. Bourke & Andres E. Hernandez, "The 'Butner Study' Redux: A Report on the Incidence of Hands-On Child Victimization by Child Pornography Offenders," 24 *Journal of Family Violence* 183 (2009) (study of 155 federal child pornography offenders in the United States who participated in the residential sex offender treatment program at FCI Butner from 2002–05; finding that official records, including the offenders' presentence reports in their child pornography cases, revealed that 26% had previously committed a contact sex offense, yet

official reports (arrests or convictions) showed a 20-28% association between child pornography offenses and contact sex offenses.[10]  Despite these peer-reviewed studies that support lengthy sentences, some courts continue to view these offenders as simple voyeurs of relatively low risk, cowing to the hyperbolic and distinctly un-empirical criticisms of the § 2G2.2 guideline, using those criticisms as the sole basis for variance.

Another more recent study by DeLisi, et al involving federal sex offenders has reached similar findings.[11]  The 2016 DeLisi study revealed that non-contact sex offenders, such as those convicted of possession of child pornography, are very likely to have a history of contact sexual offending.[12]  This study involved 119 federal sex offenders from 2010-2015, for which 69% reported a contact sex offense during polygraph examination, divulging 397 victims.[13]  Of the

---

finding that "self reports" of the offenders in therapy revealed that *85% had committed prior "hands on" sex offenses*)(emphasis added); see also The Report, Ch. 7, p. 173 ("The six self-report studies taken together reported a rate of *55 percent*.").

[10] Janis Wolak et al., "Child Pornography Possessors: Trends in Offender and Case Characteristics," 23 *Sexual Abuse: A Journal of Research & Treatment* 22, 33–34 (2011) (finding, based on 2006 data from surveys of approximately 5,000 law enforcement officials throughout the United States, that 21% of cases that began with investigations of child pornography possession "detected offenders who had either committed concurrent sexual abuse [offenses] or been arrested in the past for such crimes"); Richard Wollert et al., "Federal Internet Child Pornography Offenders — Limited Offense Histories and Low Recidivism Rates," in *The Sex Offender: Current Trends in Policy & Treatment Practice* Vol. VII (Barbara K. Schwartz ed., 2011) (based on a study of 72 federal child pornography offenders in the United States who were treated by the authors during the past decade, the authors found that 20, or 28%, had prior convictions for a contact or non-contact sexual offense, including a prior child pornography offense).

[11] Matt DeLisi, et al., (2016),"The dark figure of sexual offending: new evidence from federal sex offenders," *Journal of Criminal Psychology*, Vol. 6, Iss. 1, pp. 3 – 15.

[12] Id. at 11.

[13] Id. at 5, 7.

119 participants, 57 had been convicted of only possession or receipt of child pornography.[14]
More than half of the offenders in the highest number-of-victims category (10 or more) had been
convicted of possessing or receiving child pornography.[15]   The two most prolific offenders –
with 22 and 24 victims – were child pornography offenders.[16]   The study concluded "the current
analyses indicate that child pornography offenders are significantly more severe than their instant
conviction offense indicates.  More often than not, they are contact sexual abusers." [17]

    In this case, Louk argues that he had a non-sexual motivation for viewing child
pornography.  The essence of his explanation for the images is that he was bored because he
could no longer work.  He claims that he looked at the images because it was a rush, like
watching someone get their head chopped off.  However, Louk did not save any other type of
"rush" image on his computer.  Moreover, Louk admitted to SA Liberti that he *did* masturbate to
images of child pornography.  It begs the question, how can someone become sexually aroused
by child pornography if they are not sexually interested in sex act involving children.  Perhaps
Louk will argue that he was sexually aroused by the violence inflicted on the babies and toddlers.
The Government would respond – is that any better?

    With that information in mind, the United States does not ask the Court to use the Bourke
study, or any of the studies discussed, as proof of uncharged crimes.  There is no evidence in this
case that Louk ever sexually touched a child.  However, the United States does submit that these
studies highlight the seriousness of the offense, as well as the rightness of Congress's

---

[14] Id. at 6.

[15] Id. at 7, 11.

[16] Id. at 11.

[17] Id.

intervention. These two studies show that "lay people's intuition" and Congress has been right all along and that Congressional "meddling" in the § 2G2.2 guideline was justified. These studies demonstrate that earlier judicial reliance upon arguments attacking the Guidelines was unfortunately misplaced and that judicial variances downward, based solely upon a "policy disagreement" with the formulation of the § 2G2.2 guideline, are unsupportable if not irresponsible. In sum, these studies support the Government's request for a Guidelines sentence.

      B.    <u>THE GUIDELINES AND THE DISTRIBUTION ENHANCEMENT</u>

Louk's base offense level is 22 and he is not entitled to a two level decrease pursuant to § 2G2.2(b)(1). (<u>See</u> R. 21: PSR, Objection to Paragraph 16, PageID 87). Section 2G2.2(b)(1) allows for such decrease if "the defendant's conduct was limited to the receipt or solicitation of material involving the sexual exploitation of a minor" and "the defendant did not intend to traffic in, or distribute, such material." "Consistent with [the language of § 2G2.2(b)(1)] . . . the two requirements are conjunctive, meaning the absence of either one defeats a request for the reduction." <u>United States v. Abbring</u>, 788 F.3d 565, 568 (6th Cir. 2015).

Even if Louk argues that he did not intend to distribute, he cannot say that his conduct was limited to receipt. Det. Sumpter was able to conduct a single-source download from Louk of one complete video and multiple partial segments of videos that depict child pornography. Further, Det. Sumpter could see that between the dates of February 8, 2017, and January 2, 2019, Louk had 158 "Child Notable/Child Erotic/Child Other/Unknown Content" unique files that he was sharing. Finally, the North Ridgeville Police Department made 17 single-source complete downloads of child pornography from Louk between the dates of August 6, 2018, and December 10, 2018. They also made 17 partial downloads of child pornography from Louk. (R. 21: PSR ¶¶7-8, PageID 72). <u>See</u> <u>Abbring</u>, 788 F.3d at 568 (finding that use of a P2P network with

14

sharing settings enabled precludes an argument that "there was no distribution in the sense of transfer or sharing (even without regard to knowledge)".  Because Louk's conduct was not limited to receipt, his base offense level should be 22.

Louk received, distributed and possessed child pornography depicting pre-pubescent minors or minors who had not attained the age of 12 years.  In fact, a large volume of his collection involved babies and toddlers.  (R. 21: PSR, ¶ 10, PageID 73).  Therefore, a two-level increase pursuant to § 2G2.2(b)(2) should apply.

The two-level increase for distribution, as contemplated by the revised § 2G2.2(b)(3)(F), now requires proof that the defendant knew of the file-sharing properties of the P2P network. U.S.S.G. App. C, Amendment 801, pp. 144-45.  Application Note 1 defines "Distribution" as

> [A]ny act , including possession with intent to distribute, production, transmission, advertisement, and transportation, related to the transfer of material involving the sexual exploitation of a minor.  Accordingly, distribution includes posting material involving the sexual exploitation of a minor on a website for public viewing but does not include the mere solicitation of such material by a defendant.

The Application Notes, under #2, further state that "the purpose of subsection (b)(3), the defendant "knowingly engaged in distribution" if the defendant (A) knowingly committed the distribution, (B) aided and abetted, counseled, commanded, introduced, procured, or willfully caused the distribution, or (C) conspired to distribute."

Sixth Circuit law states that "[t]he use of a file-sharing program like Ares readily 'relate[s] to the transfer' of files because the whole point of a file-sharing program is to share, sharing creates a transfer, and transferring equals distribution." Abbring, at 567 (2015).  In United States v. Dunning, 857 F.3d 342 (6th Cir. 2017), the defendant attempted to distinguish

Abbring from his peer-to-peer conduct in a post-Amendment sentencing.  The Court rejected

Dunning's argument and upheld the two-level enhancement in a case very similar to Louk's.

> In this case, there is no direct evidence that shows that Dunning knew how the software operated because he made no admission that he knew how the peer-to-peer software worked. The court in Abbring recognized that the Eighth Circuit had "held that offenders using peer-to-peer file-sharing software may rebut [an] inference of knowing distribution with 'concrete evidence of ignorance.' " Abbring, 788 F.3d at 568 (citing United States v. Durham, 618 F.3d 921, 931–32 (8th Cir. 2010), which stated that "unless a defendant presents 'concrete evidence of ignorance,' the fact-finder may reasonably infer the defendant utilized a file-sharing program to distribute files" (internal citation omitted)). But in Abbring we noted that while this circuit has never so held, we had not needed to reach the question in that case because Abbring had admitted that he knew how the peer-to-peer software operated. Although Dunning has not admitted that he knew how peer-to-peer file-sharing software works, neither has he presented any evidence that he did not know that file-sharing software shares—and thus distributes—files. Not only could the fact-finder have reasonably inferred that Dunning knew that his use of a file-sharing program distributed files, Dunning's argument that he removed the files from the software so that others would no longer have access to them undermines his argument that he did not know that the file-sharing software shares files.
>
> Dunning's knowing use of peer-to-peer software justifies the distribution enhancement. Dunning used peer-to-peer software to download files, and while he was doing so, he was also sharing these files with others. He presented no evidence that he was ignorant of the software's sharing function, and the district court reasonably applied the two-level enhancement for distribution.
>
> Dunning, at 350.

Here, Louk amassed a huge collection of child pornography videos using the Shareaza

peer-to-peer file sharing program. He told investigators he starting looking at child pornography

16

approximately five years ago.  The downloads in this case, Louk's statements and omissions, and the forensic evidence in this case support he two level enhancement for knowing distribution.

- Det. Sumpter was able to completely download via single-source download, one file (a 19 1/2 minute video), and partially download 26 other image files from Louk's computer between the dates of December 17, 2018 and January 8, 2019.

- The North Ridgeville Police Department was able to download 17 complete single-source downloads from Louk, and 19 partial single source downloads of child pornography.

- The date range for the North Olmsted downloads was August 6, 2018 through December 10, 2018.  The chart on page 3 of the Government's Sentencing Memorandum (Exhibit A) lists the various dates and times the downloads occurred.

- Louk told investigators that he got the child pornography using the "sharing site" and that "you get music off of it."  He never made any mention of disabling the sharing function to prevent others from downloading from him.

- During the installation of Shareaza, a file sharing program, the user is prompted to select which folder, if any the user wishes to make available for sharing.  (See Exhibit D: Screen captures of the Shareaza installation process).





- Det. Sumpter forensically examined Louk's e-machine computer.  He located the installed application, Shareaza, on Louk's hard drive in the folder "Program Files."  Det. Sumpter reviewed the Shareaza system registry on Louk's computer and confirmed that this application was set to share files once they were

downloaded. The default "share" folder is Downloads, and that is where Det.

Sumpter located approxiamtely749 separate video files of child pornography.

All of this information consistently points to the conclusion that Louk knowingly

distributed child pornography by a preponderance of the evidence. If Louk submits that he

intentionally disabled the sharing feature[18], it serves only to highlight Kouk's knowledge of the

feature. However, the fact of the matter is – he did not. Further, Louk's expert report from C.

Mathew Curtin of Interhack conveniently remains silent on that issue. Mr. Curtin physically

examined a mirror-image of Louk's computer on at least two occasions. The second visit was

specifically for the purpose of examining the issue of file sharing. He opines on which files were

shared (actually he doesn't because he claims he did not have the records he needed[19]) but does

not tell this Court that he also found the sharing option turned on.

Even if this court were find the evidence insufficient to support the 2-point enhancement

for distribution, such finding would not affect the analysis under § 2G2.2(b)(1). "[J]ust because

a defendant has not 'distributed' material pursuant to U.S.S.G. § 2G2.2(b)(3), he is not

necessarily entitled to the reduction under § 2G2.2(b)(1)." United States v. Shepard, 661 F.

App'x 348, 353-54 (6th Cir. 2016). In Shepard, the Court found that even though the

defendant's mere use of Limewire, see id. at 350, may not have been enough for the two-level

distribution enhancement, as "a user of file-sharing software, who enables others to view and

---

[18] In Louk's Diagnostic Assessment, it states that Louk "expressed frustration regarding the distribution charge, adding that he was always careful to not share the videos he had downloaded but noted that they must have "caught me in the act of downloading"."

[19] Mr. Curtain did not request these files from Det. Sumpter when they met and the defense did not request any additional computer data through the discovery process. This is the first the Government learned of this claim.

19

download his illicit images and/or videos, [he] has not limited his conduct [to receipt]." Id. at 353.

## III.    APPLICATION OF § 3553(A) FACTORS

### A.    NATURE AND CIRCUMSTANCES OF THE OFFENSE

The Government refers to the Statement of Facts section herein and Defendant's PSR for descriptions of the nature and circumstances of the offenses in the case at bar.

### B.    HISTORY AND CHARACTERISTICS OF THE DEFENDANT

The defendant submitted a letter from Forensic Psychologist Sara G. West, M.D. summarizing her psychiatric examination and diagnostic assessment of Brian Louk.  This psychiatric "assessment" is highly unusual in that there is no mention of any type of psychological assessment instrument used during the evaluation.  Further, there is no mention or analysis of potential risk factors for recidivism or future harm to child.  Most importantly, there's no mention of the underlying facts of the case.  Specifically, no mention of the fact that Louk masturbated to videos of tortured babies and toddlers.

### C.    NEED FOR THE SENTENCE IMPOSED TO REFLECT SERIOUSNESS OF OFFENSE, PROMOTE RESPECT FOR THE LAW, AND PROVIDE JUST PUNISHMENT

Louk amassed a collection of child pornography that would make most observers vomit from its content.  In fact, it did make SA Liberti, a seasoned investigator of child exploitation matters, vomit.  The level of depravity and deviance captured in the images he possessed is lost in mere physical descriptions.

In Bistline, the Sixth Circuit noted a reasonable sentence must reflect the seriousness of the offense or provide for any general or specific deterrence. United States v. Bistline, 665 F.3d 767-68 (6th Cir. 2012). A sentence at the low end of the Guidelines range would offend the seriousness of the offense and the impact on its victims. Congress has plainly indicated "[e]very

instance of viewing images of child pornography represents a . . . repetition of their abuse." 18 U.S.C. § 2251 (Historical and Statutory Notes: Child Pornography Prevention of 2006, Pub. L. No. 109-248, Title V, § 501, July 27, 2006, 120 Stat. 587, 623 (2006)). The words of Congress and many courts echo the victims themselves. For many victims, the downloading of images is just as traumatic as the initial act of abuse. These victims express embarrassment of being depicted in these extremely vulnerable situations. They also express fear of being watched and subsequently recognized by people like Louk who fixate on videos and images of them.

Defendant committed child exploitation offenses in the comfort and privacy of his own home, and he alone is responsible for his actions and the impact they have had on the children depicted in those images.

> D.    NEED FOR SENTENCE TO AFFORD ADEQUATE DETERRENCE

Congress, the Supreme Court, and the Sentencing Commission believe general deterrence is a very important factor when considering an appropriate sentence. United States v. Irey, 612 F.3d 1160, 1206 (citing United States v. Ferber, 458 U.S. 747, 760 (1982) (The most expeditious if not the only practical method of law enforcement may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product); Osbourne v. Ohio, 495 U.S. 102, 109-10 (1990) (It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand); United States v. Goff, 501 F.3d 250, 261 (3rd Cir. 2007) (Deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing.); United States v. Barevich, 445 F.3d 956, 959 (7th Cir. 2006) (The avenue Congress has chosen to weaken the child pornography industry is to

punish those who traffic in it. Transporting and receiving child pornography increases market

demand. The greater concern under the Guidelines is for the welfare of these exploited

children.). In United States v. Goldberg, 491 F.3d 668, 672 (7th Cir. 2007), the court opined:

> Young children were raped in order to enable the production of the pornography
> that the defendant both downloaded and uploaded, consumed himself and
> disseminated to others.  The greater the customer demand for child pornography,
> the more that will be produced.  Sentences influence behavior, or so at least
> Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory
> sentencing factor.  The logic of deterrence suggests that the lighter the punishment
> for downloading and uploading child pornography, the greater the customer
> demand for it and so more will be produced.

In fact, the Bistline Court reversed a district court that failed to see any importance in

general deterrence. See United States v. Bistline, 665 F.3d 758, 767 (6th Cir. 2012). The district

court stated, "general deterrence . . . will have little [if] anything to do with this particular case."

Id. The Sixth Circuit found "that [the district court's] statement is inexplicable, and in any event

conflicts with our statement that 'general deterrence is crucial in the child pornography

context[.]'" Id.  (citing United States v. Camiscione, 591 F.3d 823, 834 (6th Cir. 2010)).

Despite the fact that Louk and others who have an overwhelming interest in the sexual

assault of young children may not be deterred even if the sentence for the crimes was life, it is

also true that others would certainly not be deterred if Louk received a low sentence. Child

pornography offenders are known to communicate via the Internet and they are concerned

enough about law enforcement that they encrypt their hard drives, seek foreign websites, and

use anonymous phone apps in an effort to prevent detection.  There is much to be gained by a

significant sentence—increased safety for our children.

IV. **MONETARY PENALTIES**

A. FINE

The Government concedes Louk does not have the current ability to pay a fine in this matter and suggests that an analysis of Louk's future ability to make money should be directed toward his special assessment.

B. 18 U.S.C. § 3014 ADDITIONAL SPECIAL ASSESSMENT

Louk is also subject to a mandatory $5,000 Additional Special Assessment under 18 U.S.C. § 3014. The statute states, in pertinent part:

> Beginning on the date of enactment of the Justice for Victims of Trafficking Act of 2015 and ending on September 30, 2019, in addition to the assessment imposed under section 3013, **the court shall assess an amount of $5,000 on any non-indigent person or entity convicted of an offense under**—
>
> **(1)** chapter 77 (relating to peonage, slavery, and trafficking in persons);
>
> **(2)** chapter 109A (relating to sexual abuse);
>
> **(3) chapter 110 (relating to sexual exploitation and other abuse of children)**;
>
> **(4)** chapter 117 (relating to transportation for illegal sexual activity and related crimes)....
>
> 18 U.S.C. § 3014(a) (emphasis added).

These assessments are deposited in the Domestic Trafficking Victims' Fund and awarded as grants or enhanced programming for victims. 18 U.S.C. §§ 3014(c) and (e)(1). Because Defendant has been convicted of an offense under Chapter 110, the Court must impose this additional special assessment unless it finds he is unable to pay; however, both Defendant's current and future financial status is to be evaluated when making the indigency determination under § 3014. See United States v. Shepherd, 922 F.3d 753 (6th Cir. 2019). See also   United

States v. Janatsch, 722 F. App'x 806, 810-11 (10th Cir. 2018).  That is, negative net worth at the time of sentencing is not dispositive of the issue.  United States v. Kelley, 861 F.3d 790, 801-802 (8th Cir. 2017).  If "at some point" a defendant would be able to pay the Additional Special Assessment, "[t]his ability to earn money in the future preclude[s] a finding of indigence for purposes of § 3014."  Id.

This is consistent with a similar finding by another Judge in this District on August 20, 2018, in United States v. Phillip Carl, case number 3:17CR159, in which the defendant was represented by a Federal Defender's Office due to a finding of indigency.  The Court, relying on the PSR, found a present inability to pay, but found Carl was part-owner of property and also young enough that work following release was likely.  See also, United States v. Lail, 2018 WL 2771112 (4th Cir. 2018), (imposition of the $5,000 assessment warranted based on future ability to pay following sale of defendant's house even though indigent at sentencing, represented by the Federal Defender, and unable presently to pay); United States v. Rodgers, 711 F. App'x 229, 230 (5th Cir. 2018) (citing United States v. Magnuson, 307 F.3d 333, 335 (5th Cir. 2002) ($5,000 assessment warranted where defendant had title to certain assets and potential employability sufficient to pay even though PSR found present inability to pay).

As the Tenth Circuit noted, "nothing in the statute precludes an examination of future ability to pay as part of a holistic assessment of the indigency determination."  United States v. Janatsch, 722 F. App'x 806, 810-11 (10th Cir. 2018).  On the contrary, as the Court in that case noted, "[the defendant]'s going to have plenty of time to pay that off while incarcerated."  Id. at 806, 810-11.  That is precisely the case here.  Louk has assets.  Furthermore, Louk will be in prison for at least the next 5 years, much longer if a Guideline sentence is imposed, and during that time, he can participate in the IFRP, which affords him the future ability to pay both the fine

and additional special assessment.  Thereafter, Louk will be on at least five years of Supervised

Release.  Therefore, Louk should be ordered to pay the $5,000 additional special assessment.

## V.    CONCLUSION

For these reasons and those to be articulated at the sentencing hearing, the United States

respectfully requests that the Court impose a term of imprisonment within the advisory

Guidelines range of 151 to 188 months.


Respectfully submitted,

JUSTIN E. HERDMAN
Acting United States Attorney

By:    /s/ Carol M. Skutnik
       Carol M. Skutnik (OH: 0059704)
       Assistant U.S. Attorney
       801 West Superior Avenue, Suite 400
       Cleveland, Ohio 44113
       Tel. No. (216) 622-3785
       E-mail: carol.skutnik@usdoj.gov


## CERTIFICATE OF SERVICE

I certify that on August 2, 2019, copy of the foregoing Government's Sentencing

Memorandum was filed electronically.  Notice of this filing will be sent by operation of the

Court's electronic filing system to all parties indicated on the electronic filing receipt.


/s/ Carol M. Skutnik
Assistant U.S. Attorney